**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ELIZABETH MICHELLE ANGELL, and
BRETT ANGELL, her husband,

        Plaintiffs,

                                   Case No. 3:18-cv-282-J-34JBT

vs.

ALLERGAN SALES, LLC, a foreign
limited liability company,

        Defendant.

_____

ASHLEY J. HICKS,

        Plaintiff,

                                   Case No. 3:18-cv-283-J-34JBT

vs.

ALLERGAN SALES, LLC, a foreign
limited liability company,

        Defendant.

_____/

## O R D E R

**THIS CAUSE** is before the Court on motions to dismiss in two related cases. Plaintiffs Elizabeth and Brett Angell, as well as Plaintiff Ashley J. Hicks bring related lawsuits against Defendant Allergan Sales, LLC (Allergan), stemming from Allergan's warranty program for its saline-filled breast implants. See Angell v. Allergan Sales, LLC, Case No. 3:18-cv-283-J-34JBT (Angell Action); Hicks v. Allergan Sales, LLC, Case No. 3:18-cv-283-J-34JBT (Hicks Action).[1] In both cases, Plaintiffs allege that plastic surgeons

---

[1] The Court notes that there are numerous related cases pending in the Jacksonville Division of this Court. Upon joint motion of the parties involved in those cases, the Court has stayed the related cases pending resolution of the instant Motions.

Loren Z. Clayman and Mark A. Clayman misused Allergan's warranty program to the detriment of their patients.  Plaintiffs contend that Allergan knew of, agreed with, and participated in the Claymans' scheme.  As such, Elizabeth Angell and Ashley Hicks (the Patients) assert claims against Allergan for aiding and abetting the Claymans' fraud/breach of fiduciary duty, and conspiracy.[2]  See generally Second Amended Complaint (Hicks Action, Doc. 45; Hicks Complaint) (Angell Action, Doc. 44; Angell Complaint), both filed on September 20, 2018.[3]  On October 4, 2018, Allergan filed a motion to dismiss in both cases.  See Defendant Allergan Sales, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint (Hicks & Angell Actions, Doc. 46; Motions).  Plaintiffs filed responses in opposition to the Motions on October 25, 2018.  See Amended Response to Motion to Dismiss Second Amended Complaint (Hicks & Angell Actions, Doc. 51; Responses).  With leave of Court, Allergan filed replies in support of its Motions on November 16, 2018.  See Allergan Sales, LLC's Reply in Support of its Motion to Dismiss Plaintiff's Second Amended Complaint (Hicks & Angell Actions, Doc. 54; Replies).  Additionally, on June 20, 2019, the Court held oral argument on the Motions to Dismiss.  See Minute Entry (Hicks & Angell Actions, Doc. 58; the Hearing), filed June 20, 2019; see also Transcript of Motion Hearing (Hicks & Angell Actions, Doc. 60; Tr.), filed June 25, 2019.

---

[2] In addition, Plaintiff Brett Angell brings a claim for loss of consortium.  See Angell Complaint ¶¶ 66-68.  As Brett Angell's sole claim is contingent on those of Elizabeth Angell, the Court will use "Angell" to refer to Elizabeth.  When necessary, the Court will refer to Brett Angell by his full name.

[3] The operative complaint is actually the third complaint filed in these two cases.  See Complaint (Hicks & Angell Actions, Doc. 1); Amended Complaint (Angell Action, Doc. 17) (Hicks Action, Doc. 16).  The Court will refer to the operative Hicks and Angell Complaints collectively as the Second Amended Complaint.  Citations to the Second Amended Complaint refer to allegations that are present in both the Hicks and Angell Complaints at the same paragraph number.  Where necessary to distinguish between the two, the Court will cite to the Hicks Complaint or the Angell Complaint specifically.

Following oral argument, with leave of Court, the parties submitted supplemental briefing. <u>See</u> Plaintiffs' Supplemental Memorandum on Actual Knowledge (<u>Hicks</u> & <u>Angell</u> Actions, Doc. 59; Plaintiffs' Supplements), filed June 25, 2019; Allergan Sales, LLC's Response in Opposition to Plaintiffs' Supplemental Memorandum on Actual Knowledge (<u>Hicks</u> & <u>Angell</u> Actions, Doc. 63; Allergan's Supplements), filed June 28, 2019. In addition, Plaintiffs filed a motion for leave to file a third amended complaint. <u>See</u> Plaintiffs' Opposed Alternative Motion and Memorandum of Law for Leave to File Third Amended Complaint (<u>Hicks</u> & <u>Angell</u> Actions, Doc. 62; Motions to Amend), filed June 26, 2019. Allergan filed a response in opposition to the Motion to Amend on July 10, 2019. <u>See</u> Defendant Allergan Sales, LLC's Opposition to Plaintiffs' Opposed Alternative Motion for Leave to File Third Amended Complaint (<u>Hicks</u> & <u>Angell</u> Actions, Doc. 64; Responses on Amendment). Last, on July 25, 2019, Plaintiffs filed a notice of supplemental authority. <u>See</u> Plaintiff's Notice of Supplemental Authority (<u>Hicks</u> & <u>Angell</u> Actions, Doc. 65). Accordingly, these matters are ripe for review.

## I.   Background[4]

### A.  The Warranty

This case arises out of Allergan's warranty program for Natrelle saline-filled breast implants manufactured by Allergan, Inc.[5]  The standard version of the "ConfidencePlus"

---

[4] In considering the Motions to Dismiss, the Court must accept all factual allegations in the Second Amended Complaint as true, consider the allegations in the light most favorable to Plaintiffs, and accept all reasonable inferences that can be drawn from such allegations. <u>Hill v. White</u>, 321 F.3d 1334, 1335 (11th Cir. 2003); <u>Jackson v. Okaloosa Cnty., Fla.</u>, 21 F.3d 1531, 1534 (11th Cir. 1994). As such, the facts recited here are drawn from the Second Amended Complaint, and may well differ from those that ultimately can be proved.

[5] According to the Second Amended Complaint, Allergan, Inc. is a multinational manufacturer of healthcare products, including the Natrelle implants. <u>See</u> Second Amended Complaint ¶ 12. The Second Amended Complaint does not describe the relationship between Allergan, Inc. and Allergan Sales, LLC, the named defendant in this action. Although Plaintiffs named Allergan, Inc. and Allergan USA, Inc. as

Warranty" is included with all of Allergan's Natrelle saline-filled breast implants and covers "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and "capsular contracture (Baker Grade III/IV) with Natrelle Gel implants that requires surgical intervention."  Second Amended Complaint ¶¶ 13-14.  It includes lifetime coverage for the replacement of a ruptured implant and ten years of coverage for the replacement of a contralateral implant.  Id. ¶ 14.  Under the warranty, Allergan provides not only a replacement implant, but also $1,200 toward the cost of the surgery to remove and replace the defective implant.  Id. ¶ 15.  For an additional $100, a patient can obtain the Premier Warranty, which provides lifetime coverage for both ruptured and contralateral implants.  Id. ¶ 14.  Under the Premier Warranty, Allergan provides the replacement implant and $2,400 "for the cost of replacement/revision surgery."  Id.  According to Plaintiffs, plastic surgeons Loren Z. Clayman, M.D. (Clayman Senior) and Mark A. Clayman, M.D. (Clayman Junior), through their medical practice, Loren Z. Clayman, M.D., P.A. (Clayman Practice), used this warranty program to defraud their patients and in doing so, breached their fiduciary duty to their patients.  Plaintiffs bring the instant action against Allergan based on Allergan's purported knowledge, agreement, and assistance with the Claymans' fraud/breach of fiduciary duty.  The details of the alleged scheme are as follows.

### B.  The Clayman Practice

According to the Second Amended Complaint, in the early 2000s, the Clayman Practice began marketing its breast augmentation services to patients of modest means.  See Second Amended Complaint ¶ 19.  The Clayman Practice attracts these patients by "charging less than any other plastic surgeons for augmentation mammoplasty

_____

defendants in their initial complaints, see Complaint (Hicks & Angell Actions, Doc. 2), Plaintiffs dropped these parties in subsequent pleadings such that Allergan Sales, LLC is the sole remaining defendant.

procedures." Id. ¶ 20.  According to Plaintiffs, the Clayman Practice is able to charge these low rates by egregiously cutting corners in their surgical procedures.  See Second Amended Complaint ¶ 21.[6]  In addition, Plaintiffs allege that "[n]o later than the mid-2000s," Clayman Senior began falsely telling his breast augmentation patients that they had defective saline-filled breast implants and recommending unnecessary removal and replacement surgery.  Id. ¶ 22.  According to Plaintiffs, "Clayman Senior lied to his patients because he knew that most of them could not afford to pay for additional surgeries, but that by claiming that saline breast implants were ruptured, deflated, or leaking, he could seek to have the breast implant manufacturers pay for additional surgeries through their Warranties."  Id.  When Clayman Junior joined the Clayman Practice in mid-2008, he adopted this practice as well and began making "an excessive or unusually high number of warranty claims for saline breast implants."  Id.  Notably, by blaming the Patients' dissatisfaction with the results of their augmentation surgery on a defective implant, the Claymans induced the Patients to have additional surgeries with the Clayman Practice, covered by the warranty, rather than seek out a different plastic surgeon or pursue a medical negligence claim.  See Hicks Complaint ¶ 54; Angell Complaint ¶ 55.

---

[6] Specifically, Plaintiffs allege that the Clayman Practice:
performed procedures within its own offices rather than at a hospital or surgical center; performed procedures without the assistance of an anesthesiologist or qualified nurse anesthetist; set up two surgical rooms connected by a swinging door, so the surgeon could have two surgeries going at one time; performed breast augmentations in only 20 to 30 minutes, when most plastic surgeons take between one and two hours; purchased saline solution in large bulk bottles rather than single use surgical bags; and used the same make and model saline breast implant for every procedure because it was the cheapest.
See Second Amended Complaint ¶ 21.  Notably, hundreds of the Claymans' former patients pursued claims against the Claymans and Clayman Practice in state court arising out of these allegations, and it appears the Claymans entered a global settlement with many of these individuals in early 2018.  The Court has no information as to whether Hicks and Angell were part of that settlement.  Regardless, the claims at issue here are not directly related to this misconduct, and Plaintiffs do not contend that Allergan had any knowledge of the troubling practices alleged in paragraph 21.

Initially, the Clayman Practice purchased saline-filled breast implants from both Allergan (or its predecessor, Inamed),[7] and Mentor, Allergan's primary American competitor for breast implants.  See Second Amended Complaint ¶ 26.  However, Mentor discontinued sales of its breast implants to the Clayman Practice after receiving a disproportionately high number of warranty claims from the Claymans, which Mentor viewed as indicative of fraud.  Id. ¶¶ 26-27.  Specifically, Mentor became suspicious when the Clayman Practice "made approximately 40 warranty claims in the preceding year, which amounted to 30% of all saline breast implants the Clayman Practice purchased from Mentor."  Id. ¶ 26.  Since this incident, the date of which is not alleged, Allergan "has been the exclusive supplier of breast implants to the Clayman Practice."  Id. ¶ 27.

### C. Ashley J. Hicks

In March of 2014, Plaintiff Ashley J. Hicks underwent breast augmentation surgery with the Clayman Practice utilizing Allergan's Natrelle saline-filled breast implants.  See Hicks Complaint ¶ 42.  In the months that followed, Hicks twice returned to the Clayman Practice with concerns about her breasts, and on November 14, 2014, she underwent a second breast surgery with the Clayman Practice.  Id. ¶¶ 43-45.  When Hicks arrived for this second surgery, the Claymans had Hicks sign an informed consent form stating that she had a "'Right Implant Deflation'" and would need to have both implants removed and replaced.  Id. ¶ 45.  The Claymans also had Hicks execute an Allergan warranty claim form which stated that "she had a deflation at her right breast implant, with 'tissue @ valve.'"  Id. ¶ 45.  However, according to Hicks, "a preoperative photograph taken that day by the

---

[7] Inamed merged with Allergan, Inc. in March of 2006.  See Second Amended Complaint ¶ 12. Inamed's "McGhan Natrelle Saline Filled Breast Implants" became known as "Allergan Natrelle Saline Filled Breast Implants" after the merger.  See id. ¶¶ 11-12.

Claymans demonstrates that she did not have a rupture, deflation, or leak at either of her breast implants." Id.[8] Nonetheless, in the November 14, 2014 operative report, Clayman Junior documented that the right implant was "'found to have a leak at the valve with tissue and what appeared to be partial delamination of the valve," and the left implant was "found to be intact." Id. ¶ 46. Both implants were removed and replaced with saline-filled Allergan implants. Id. Clayman Junior sent the warranty paperwork and two removed implants to Allergan, and Allergan later sent the Claymans a check for $2,400 in response to the warranty claim. Id. ¶ 47. Notably, Allergan's laboratory analysis of the returned implants found "no evidence of a 'loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention.'" Id. The Second Amended Complaint does not specify the date of the laboratory analysis such that it is unclear whether Allergan performed the laboratory analysis on the returned implants before or after it paid the warranty claim. Id.

Due to a "substantial difference in size between her breasts," Hicks returned to the Clayman Practice on December 5, 2016. Id. ¶ 48. "Clayman Junior recommended another removal and replacement surgery due to deflation." Id. Hicks scheduled this surgery for January 27, 2017, and Clayman Junior told her that it "would be at no cost under the Warranty." Id. ¶ 49. However, prior to the surgery, Hicks decided to seek a second opinion from a different plastic surgeon and canceled her surgery with the Clayman Practice. Id. ¶ 50. Hicks underwent surgery with a different plastic surgeon on June 7, 2017, who removed the existing saline implants and replaced them with silicone breast implants. Id. ¶ 51.

---

[8] Hicks does not allege that Allergan was aware of, had access to, or ever received this photograph.

**D. Elizabeth Michelle Angell**

Plaintiff Elizabeth Michelle Angell alleges a similar account of her experience at the Clayman Practice.  See Angell Complaint ¶¶ 40-52.  Angell initially consulted with Clayman Senior on June 12, 2008, regarding breast augmentation.  Id. ¶ 40.  "A surgery cost estimate form indicated a proposal to perform 'Augmentation Mammoplasty areola' for $3,000, plus an operating room charge of $750."  Id.  Angell underwent surgery with the Claymans on October 6, 2010.  Id. ¶ 41.  On May 4, 2015, Angell returned to the Clayman Practice with significant pain and discomfort at her right breast.  Id. ¶ 45.  "Clayman Senior told her that her right breast implant was deflated and that both of her implants needed to be removed and replaced, but that the procedure would be performed at no cost to her."  Id.  Angell and Clayman Senior signed a surgical estimate which states that "she had a 'right breast-deflation,' for which she needed a bilateral implant replacement and crescentpexy at no charge to the patient."  Id.  Angell underwent this second surgery on June 5, 2015.  Id. ¶ 46.  The surgical records state that Clayman Senior found the right implant "'to have deflation approximately 40% (tissue/leak & valve)'" and "'rt. tissue on and around valve.'"  Id. ¶ 47.  He found the left implant intact.  Id.  Clayman Senior removed both implants and replaced them with Allergan saline implants.  Id. ¶¶ 47-48.

According to the Angell Complaint, "on or about" the date of the second surgery, the Claymans had Angell "sign warranty claim paperwork indicating that her right implant had a '[h]ole in valve' and/or '[p]articles in valve.'"  Id. ¶ 49.  Allergan paid the Claymans $1,200, although Allergan's laboratory analysis of the returned implants found "no evidence of a 'loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention.'"  Id.  As with the Hicks Complaint, it is unclear when Allergan conducted the

laboratory analysis in relation to when it paid the warranty claim.  Id.  However, Angell's execution of the warranty claim form and Allergan's payment of the warranty claim are both alleged to have occurred "on or about June 5, 2015," the same date as the surgery.  Id. ¶¶ 46, 49.  As such, it appears unlikely that Allergan performed the laboratory analysis prior to paying the claim.  Angell continued to experience problems with her breasts and on July 22, 2016, she "sought a second opinion from a different plastic surgeon, who opined that her breasts were asymmetric and continued to sag."  Id. ¶¶ 51-52.  This surgeon recommended that Angell undergo "another surgery to remove and replace her implants with silicone implants."  Id. ¶ 52.

### E.  Allergan

According to Plaintiffs, Allergan knew that the Claymans were performing "unnecessary removal and replacement surgeries" in order to collect the warranty money. See id. ¶ 25.[9]  Plaintiffs allege that Allergan nevertheless continued to pay these fraudulent warranty claims as a form of "kickback" or bribe to induce the Claymans to continue purchasing Allergan products.  Id. ¶¶ 31-33.  In support of their contention that Allergan knew of the Claymans' scheme, Plaintiffs rely on the following factual allegations.  First, Plaintiffs allege that when Allergan received the warranty claim paperwork and returned breast implant(s), it would undertake a "Laboratory Analysis" on the returned implants "to determine the cause of a claimed rupture/deflation/leak" and generate a report of its findings.  See id. ¶ 24.  According to Plaintiffs, "[n]early every Laboratory Analysis report

---

[9] It is unclear what Plaintiffs mean by "unnecessary" surgeries.  Both Hicks and Angell returned to the Claymans with complaints about their breasts and ultimately, both consulted with other surgeons who performed or recommended a removal and replacement surgery.  Thus, from the facts alleged it appears that the Claymans misled the Patients about the cause of their problems, but not necessarily about the need for surgery.

for saline filled breast implants returned by the Clayman Practice found no evidence of a 'loss of shell integrity, resulting in implant rupture or deflation.'" Id. Nonetheless, Allergan paid the $1,200 or $2,400 warranty claim (depending on the type of warranty) to the Clayman Practice, for every warranty claim made by the Clayman Practice over the span of fifteen years. Id. According to the Second Amended Complaint, this amounts to a total of $8.96 million in warranty reimbursements for 5,516 pairs of returned implants. See Second Amended Complaint, Ex. B.

Of particular note, in the eight years between January 1, 2008, and December 31, 2015, the Clayman Practice's warranty claims rapidly increased. Id. In 2007, the Claymans submitted 76 warranty claims. In 2008, that number doubled to 150 warranty claims, increased to 261 claims in 2009, and then doubled again to 521 claims in 2010. Id. At their peak in 2014, the Claymans submitted 1,057 warranty claims for a total of $1.77 million in reimbursements. Id. According to Plaintiffs, in that eight year period, "Allergan sold the Clayman Practice 11,082 pairs of saline breast implants," and the "Clayman Practice made 5,118 warranty claims for saline breast implants, which amounts to a failure rate of 46%." Id. ¶ 30.[10] Thus, Plaintiffs assert that Allergan knew that the Claymans were

---

[10] Plaintiffs' calculation of the Clayman Practice's breast implant failure rate is problematic. First, Plaintiffs appear to divide the number of pairs of implants ordered by the total number of warranty claims, which can stem from only a single implant. Thus, the correct ratio appears to be 5,118 warranty claims arising out of 22,164 individual implants (11,082 x 2). These numbers generate a failure rate of 23% over the span of eight years, which, although high, is not as egregious as the 46% failure rate suggested by Plaintiffs. However, even this 23% rate appears overstated because Plaintiffs do not indicate whether the number of warranty claims cited is limited to only those claims for implants sold during the relevant eight-year period. According to the Second Amended Complaint, Clayman Senior has been performing breast augmentation surgeries with saline-filled breast implants since at least 1992, see Second Amended Complaint ¶ 18, and has been utilizing Allergan's saline-filled implants under warranty since at least as early as 2001, id., Ex. B. Notably, the "rate of spontaneous deflations" for Allergan's saline-filled breast implants increases over time, "approximately 2.7% to 6.8% at 5 years, and approximately 10% to 13.8% at 10 years . . . ." Id. ¶ 29. By comparing the total number of warranty claims the Clayman Practice made in the specific eight-year period beginning in 2008, to the number of breast implant pairs the Clayman Practice purchased in that same eight-year period, Plaintiffs fail to account for the failure of implants placed in previous years, which, given the passage of time, would have higher rates of spontaneous deflation. Although Allergan

lying to their patients based on: 1) the warranty claim forms showing that the Claymans told their patients that their implants were ruptured, deflated or leaking necessitating surgical removal and replacement, 2) Allergan's laboratory analyses which consistently showed that the returned implants were not actually defective, and 3) the volume of warranty claims submitted by the Clayman Practice evidencing a rate of failure statistically higher than shown in Allergan's own studies.  See Responses at 1-2.

Although unnecessarily paying millions of dollars to two doctors at one practice appears contrary to Allergan's own interests, Plaintiffs contend that Allergan actually had "a deep financial motive" to pay the Clayman Practice's warranty claims due to the volume of business Allergan received from the Claymans every year.  Id. ¶ 31.  According to Plaintiffs, the Clayman Practice is one of Allergan's top ten breast implant customers in Florida, and purchases "a host of other aesthetic products from Allergan," such that it is "essentially a 'one supplier shop.'"  Id.  Indeed, Plaintiffs assert that the Clayman Practice is a "Diamond Level member of the Allergan Partner Privileges program for Allergan Aesthetics products (i.e., Natrelle, Botox, Latisse, Juvederm, Kybella, SkinMedica, Vivate, and CoolSculpting)."  Id. ¶ 32.  Plaintiffs allege that "when a nurse employed by the Clayman Practice asked Clayman Senior why he believed Allergan would keep paying his high volume of warranty claims without question, Clayman Senior told her, 'I know they're going to pay them all because I'm a Diamond Level partner.'"  Id.  Thus, in Plaintiffs' view, "Allergan paid millions of dollars in false warranty claims to the Clayman Practice because it was making so much money in total sales of aesthetic products from the Clayman Practice."  Id. ¶ 33.  Notably, Plaintiffs assert that "Allergan has never confronted Clayman

---

identifies the problems with Plaintiffs' statistics in its Motions, Plaintiffs do not respond to these arguments. See Motions at 13 n.6.

Senior about his excessive warranty claims for saline breast implants." Id. ¶ 28 (emphasis added).   In contrast, Plaintiffs allege that in response to warranty claims from other plastic surgeons, Allergan demanded further proof that the "claimed ruptures, deflations, or leaks were not the result of actions by patients or surgeons."  Id. ¶ 34.  Allergan did so "even though the other plastic surgeons made fewer than 5 saline breast implant warranty claims per year."  Id.  Plaintiffs allege that the difference in treatment stems from the fact that these surgeons are not "one supplier shops" like the Clayman Practice.  Id.

In addition, Plaintiffs allege that Allergan pays the warranty claims with an "'off-balance-sheet' method."  Id. ¶ 35.  Plaintiffs explain this method as follows:

> [T]o the best of the undersigned attorney's information and belief, Allergan pays breast implant warranty claims through Del Mar Indemnity Company, LLC, a captive insurance company created and owned by Allergan.  When a manufacturer such as Allergan creates a captive insurance company, the manufacturer is provided a means of reclassifying otherwise taxable income from across its various divisions and subsidiaries as 'premium payments' that go to the captive insurance company.  The formerly taxable income that is reclassified as 'premiums' then accumulates within the captive, making it, essentially, a very large 'slush fund.'  In the event that the manufacturer uses the captive insurance company to pay a 'loss,' such as a warranty payment, the loss is not reflected in Allergan's balance sheets or filings with the Securities and Exchange Commission.  In addition, because the captive is not a third-party company, Allergan is free to manipulate the claims payment process without outside interference.

See id.  Plaintiffs also maintain that Allergan has a history of paying bribes or kickbacks to physicians for purchasing Allergan's products.  Id. ¶¶ 36-39.[11]  As such, Plaintiffs contend

---

[11] Notably, the circumstances of these other kickback schemes are significantly different than the scheme alleged here.  In these prior cases, Allergan was accused of: providing free dinners, entertainment, office supplies, drug samples, and workshops to physicians; making payments to physicians disguised as grants, speaking fees, and consulting fees; and providing valuable services to physicians such as business consulting services or continuing medical education.  Id. ¶ 38.  However, as described in the Second Amended Complaint, none of those cases appear to involve Allergan paying millions of dollars in kickbacks to two doctors at a single practice.

that Allergan was knowingly involved in the Claymans' scheme as "part of a larger course of conduct whereby the company's marketing plan includes bribing physicians." Id. ¶ 39.

Based on the foregoing, Plaintiffs initiated the instant actions against Allergan in state court.  Allergan removed the cases to this Court on February 26, 2018, and Plaintiffs twice amended their pleadings thereafter.  In the operative Second Amended Complaint, Angell and Hicks assert two claims against Allergan—(1) aiding and abetting fraud/breach of fiduciary duty, and (2) conspiracy.  Additionally, in the Angell Action, Plaintiff Brett Angell brings a derivative loss of consortium claim against Allergan.  Allergan moves to dismiss these claims as preempted under federal law.  Allergan also contends that dismissal is warranted because Plaintiffs fail to allege sufficient facts to state a plausible claim for relief.

## II.   Standard of Review

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  In addition, all reasonable inferences should be drawn in favor of the plaintiff.  See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010).   Nonetheless, the plaintiff must still meet some minimal pleading requirements.  Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted).  Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Further, the plaintiff must allege "enough facts to state a claim that is plausible on its face." Twombly, 550 U.S. at 570.  "A claim has facial

13

plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 678, 680.  Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

In addition to the minimal pleading requirements outlined above, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988) (quotation omitted). Thus, Rule 9(b) "'ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . .  [and] protects defendants from harm to their goodwill and reputation.'" Wagner v. First Horizon Pharm. Corp., 464

F.3d 1273, 1277 (11th Cir. 2006) (quotation omitted) (alterations in <u>Wagner</u>).   Although

"'alternative means are also available[,]'" the requirements of Rule 9(b) may be satisfied by

specific allegations as to "'date, time or place.'"   <u>See</u> <u>Tello v. Dean Witter Reynolds, Inc.</u>,

494 F.3d 956, 972-73 (11th Cir. 2007) (quoting <u>Durham</u>, 847 F.2d at 1511).   Thus, a

complaint satisfies Rule 9(b) if it

> sets forth "(1) precisely what statements were made in what documents or
> oral representations or what omissions were made, and (2) the time and
> place of each such statement and the person responsible for making (or, in
> the case of omissions, not making) same, and (3) the content of such
> statements and the manner in which they misled the plaintiff, and (4) what
> the defendants obtained as a consequence of the fraud."

<u>Id.</u> at 972 (quoting <u>Ziemba v. Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1202 (11th Cir. 2001)).

Nonetheless, "Rule 9(b) does not require a plaintiff to allege specific facts related to the

defendant's state of mind when the allegedly fraudulent statements were made[,]" and thus,

for purposes of Rule 9(b), "it is sufficient to plead the who, what, when, where, and how of

the allegedly false statements and then allege generally that those statements were made

with the requisite intent."   <u>Mizzaro v. Home Depot, Inc.</u>, 544 F.3d 1230, 1237 (11th Cir.

2008).

## III.    Motions to Amend

As stated above, following oral argument on the Motions to Dismiss, Plaintiffs filed

Motions to Amend their pleadings.   In the Motions to Amend, Plaintiffs maintain that the

Second Amended Complaint is sufficient to state their claims, but "in the abundance of

caution and in the alternative," seek leave to file a proposed third amended complaint in

both of their cases.   <u>See</u> Motions to Amend at 1.   The proposed third amended complaint

contains one substantive change, found in paragraph 34.   As currently drafted, paragraph

34 states:

> Other plastic surgeons report that in response to their saline breast implant warranty claims, Allergan demanded further proof that the claimed ruptures, deflations, or leaks were not the result of actions by patients or surgeons, even though the other plastic surgeons made fewer than 5 saline breast implant warranty claims per year.  The key distinction between these other plastic surgeons and the Clayman Practice is that the other plastic surgeons were not "one supplier shop," and they purchase their aesthetic products (including saline breast implants) from more than one supplier.

See Second Amended Complaint ¶ 34.   Plaintiffs request leave to add the following additional sentence, inserted after the word year: "Allergan has denied warranty claims by at least one large plastic surgery practice known to Plaintiffs' counsel, and discovery may reveal that Allergan has denied the warranty claims of many other plastic surgeons."  See Motions to Amend at 1-2, Ex. 1 ¶ 34.

Rule 15(a)(1) establishes that "[a] party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Thereafter, a party may amend its pleadings only upon leave of court or by obtaining written consent of the opposing party.  See Rule 15(a)(2).  The Rule provides that "[t]he court should freely give leave when justice so requires."  Id.  As a result, "[t]here must be a substantial reason to deny a motion to amend."  Laurie v. Ala. Ct. of Crim. App., 256 F.3d 1266, 1269, 1274 (11th Cir. 2001) (per curiam).  Substantial reasons justifying a court's denial of a request for leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  Foman v. Davis, 371 U.S. 178, 182 (1962); see also Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ. ex rel. Univ. of S. Fla., 342 F.3d

1281, 1287 (11th Cir. 2003).   To avoid any unnecessary duplication of effort, the Court includes this additional allegation in its analysis of the Motions to Dismiss below.   Because the Court finds that the Motions to Dismiss are due to be granted, even considering the new allegation, the Court will deny the Motions to Amend as futile.

## IV.   Judicial Notice

Allergan attaches several documents stemming from the FDA's pre-market approval of saline-filled breast implants to its Motions to Dismiss.   These documents include the FDA's Approval Order Letter, see Motions, Ex. A, the Summary of Safety and Effectiveness Data, id., Ex. B, the PMA approved labeling for the device, id., Ex. C, and a document for patients entitled "Making an Informed Decision, id., Ex. D.   Allergan asserts that the Court may take judicial notice of these documents which are freely available to the public on the FDA's website.   See Motions at 6 n.2.   Plaintiffs argue that the Court should not consider these exhibits as they are not central to the claims raised in the Second Amended Complaint.   See Responses at 3.   Plaintiffs' argument fails to appreciate that the Court may consider properly judicially noticed documents.   See Adamson v. Poorter, No. 06-15941, 2007 WL 2900576, at *2 (11th Cir. Oct. 4, 2007) (outlining the three exceptions to the rule that considering material outside of the pleadings converts a motion to dismiss into a motion of summary judgment, one of which is properly judicially noticed documents, another of which is authentic documents central to the claims); see also Horne v. Potter, 392 F. App'x 800, 802 (11th Cir. 2010); Klopfenstein v. Deutsche Bank Sec., Inc., 592 F. App'x 812, 816 n.5 (11th Cir. 2014); Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding.").   Upon review, the Court determines that these documents are matters of public record of which the Court may take judicial notice without

converting the Motions to Dismiss into ones for summary judgment.  See Stanifer v. Corin USA Ltd., Inc., No. 6:14-cv-1192-Orl-37DAB, 2014 WL 5823319, at *3 (M.D. Fla. Nov. 10, 2014); see also Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).  However, the Court relies on these documents solely to recognize that, as a condition of approval, the FDA requires Allergan to conduct "a study of explanted devices in order to determine the modes of failure," because "[t]his should lead to better device designs and, in the long term, to a reduction in the failure rates."  See Motions, Ex. B at 22.  Allergan is required to report this information to the FDA.  See id., Ex. A at 1-2.

## V.   Sufficiency of the Claims

Allergan raises two primary arguments in its Motions.  First, Allergan contends that Plaintiffs' claims are expressly preempted pursuant to the Medical Device Amendments of the Food, Drug, and Cosmetic Act (FDCA), see 21 U.S.C. § 360k(a), or impliedly preempted by the FDCA, see 21 U.S.C. § 337(a).  In addition, Allergan maintains that Plaintiffs fail to plead sufficient facts to support the aiding and abetting, and conspiracy claims.  In accordance with the Eleventh Circuit Court of Appeal's instruction in Mink v. Smith & Nephew, Inc., 860 F.3d 1319, 1328 (11th Cir. 2017), the Court will first determine whether Plaintiffs have adequately alleged viable claims under Florida law, and only then consider Allergan's preemption arguments, if necessary.  See Mink, 860 F.3d at 1328 ("Because preemption is a principle derived from the Supremacy Clause, U.S. Const. Art. VI, cl. 2, we must first analyze whether each claim can stand under state law, and only then decide the preemption questions where necessary."); see also Godelia v. Doe, 881 F.3d 1309, 1317 (11th Cir. 2018) ("[W]e will first examine each claim under Florida law and only

if it is viable under state law, will we then consider whether it is expressly or impliedly preempted.").

## A.  Aiding and Abetting

Under Florida law, to state a claim for aiding and abetting a common law tort,[12] a plaintiff must allege: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abetter [sic]; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor."  See Lawrence v. Bank of Am., N.A., 455 F. App'x 904, 906 (11th Cir. 2012)[13] (citing AmeriFirst Bank v. Bomar, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991)); see also Perlman v. Wells Fargo Bank, N.A., 559 F. App'x 988, 993 (11th Cir. 2014); S&B/BIBB Hines PB 3 Joint Venture v. Progress Energy Fla., Inc., 365 F. App'x 202, 207 (11th Cir. 2010).  Significantly, "the second element—knowledge—will only be satisfied if the plaintiff pleads facts demonstrating that the [secondary wrongdoer] had 'actual knowledge' of the wrongdoings."  See Perlman, 559 F. App'x at 993; see also Wiand v. Wells Fargo Bank, N.A., 938 F. Supp. 2d 1238, 1246-47 (M.D. Fla. 2013) (rejecting argument that reckless conduct is sufficient and finding that Florida law requires actual knowledge).  "And while

---

[12] Plaintiffs' aiding and abetting claims are premised on the underlying torts of fraud and breach of fiduciary duty.  Allergan does not challenge the sufficiency of the allegations as to the underlying torts.  As such, the Court's analysis will focus on the elements necessary to establish aiding and abetting liability.  See Lawrence v. Bank of Am., N.A., 455 F. App'x 904, 906 (11th Cir. 2012) (analyzing together aiding and abetting claims based on common law fraud, conversion and breach of fiduciary duty).  In addition, the Court notes that "[a]lthough no Florida court has explicitly recognized a cause of action for aiding and abetting fraud, Florida courts have assumed that the cause of action exists."  See Chang v. JPMorgan Chase Bank, N.A., 845 F.3d 1087, 1097 (11th Cir. 2017) (citing ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md., 917 So. 2d 368, 371-72 (Fla. 5th Dist. Ct. App. 2005)).  Allergan does not challenge the existence of such a claim under Florida law.

[13] "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

actual knowledge may be shown by circumstantial evidence, the circumstantial evidence must demonstrate that the aider and abettor <u>actually knew</u> of the underlying wrongs committed." <u>Perlman</u>, 559 F. App'x at 993 (emphasis added) (citing <u>Wiand</u>, 938 F. Supp. 2d at 1244); <u>see also Honig v. Kornfeld</u>, 339 F. Supp. 3d 1323, 1343-44 (S.D. Fla. 2018) ("Florida law requires that a defendant have actual 'knowledge of the underlying fraud or breach of fiduciary duty,' not merely that certain 'red flags' indicate a defendant 'should have known' of the breach." (quoting <u>Lamm v. State Street Bank & Trust</u>, 749 F.3d 938, 950 (11th Cir. 2014))); <u>Wiand</u>, 938 F. Supp. 2d at 1244 (citing <u>Aetna Cas. & Sur. Co. v. Leahey Constr. Co., Inc.</u>, 219 F.3d 519, 536 (6th Cir. 2000) ("[E]vidence establishing negligence, i.e., that a [secondary wrongdoer] 'should have known,' will not suffice.")).

In their Responses, Plaintiffs argue that "a general awareness of [one's] role in the other's tortious conduct" is sufficient to establish the knowledge prong for aiding and abetting liability. <u>See</u> Responses at 5 (citing <u>Aetna Cas. & Sur. Co.</u>, 219 F.3d at 533-34 and <u>FDIC v. First Interstate Bank of Des Moines, N.A.</u>, 885 F.2d 423, 430-31 (8th Cir. 1989)). In support, Plaintiffs point to <u>Halberstam v. Welch</u>, 705 F.2d 472, 477 (D.C. Cir. 1983) where the court stated that the second element of an aiding and abetting claim requires the defendant to be "generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance . . . ." <u>See Halberstam</u>, 705 F.2d at 487-88. Plaintiffs assert that "<u>Halberstam</u> is instructive on Florida law because it relied on Section 876 of the Restatement (Second) of Torts, which has been cited by a Florida appellate court as authority for aiding-and-abetting liability." <u>See</u> Responses at 5 n.1 (citing <u>Kilgus v. Kilgus</u>, 495 So. 2d 1230, 1231 (Fla. 5th Dist. Ct. App. 1986) and <u>Roos v. Morrison</u>, 913 So. 2d 59 (Fla. 1st Dist. Ct. App. 2005)).

The Court questions the degree to which <u>Halberstam</u> is instructive on the knowledge element of aiding and abetting liability under Florida law.[14]  Regardless, even to the extent "general awareness" satisfies the knowledge element, this awareness must nevertheless be <u>actual</u>.  <u>See</u> <u>Aetna Cas. & Sur. Co.</u>, 219 F.3d at 536 (finding "no conflict between the position that an aider and abettor must have actual knowledge of the primary party's wrongdoing and the statement that it is enough for the aider and abettor to have a general awareness of its role in the other's tortious conduct for liability to attach); <u>see</u> <u>also</u> <u>Woodward v. Metro Bank of Dallas</u>, 522 F.2d 84, 96 (5th Cir. 1975) (utilizing the "general awareness" standard but explaining that "the proof must demonstrate <u>actual</u> awareness of the party's role in the fraudulent scheme" (emphasis added)).[15]  As explained in <u>Aetna Casualty & Surety Co.</u>, "if one is aware that he has a role in an improper activity then surely he knows that the primary party's conduct is tortious."  <u>Aetna Cas. & Surety Co.</u>, 219 F.3d at 534 (internal citation omitted); <u>see</u> <u>also</u> <u>Peterson v. Aaron's, Inc.</u>, No. 1:14-CV-1919-TWT, 2017 WL 4390260, at *6 (N.D. Ga. Oct. 3, 2017) ("Of course, having a general awareness of one's role in wrongful conduct necessarily presupposes that one had any

---

[14] In <u>Halberstam</u>, the court found that the defendant not only "had a general awareness of her role in a continuing criminal enterprise," but also "assisted the [primary wrongdoer] with knowledge that he had engaged in illegal acquisition of goods."  <u>See</u> <u>Halberstam</u>, 705 F.2d at 488.  Indeed, the court upheld the trial court's finding after a bench trial that the defendant "'knew full well the purpose of [the primary wrongdoer's] evening forays and the means' he used to acquire their wealth."  <u>Id.</u> at 486.  As such, the focus of the legal analysis in <u>Halberstam</u> was not the requisite level of knowledge necessary to impose liability, but rather the meaning of "substantial assistance."  <u>Id.</u> at 481-84, 488.  Likewise, in <u>Kilgus</u>, Florida's Fifth District Court of Appeal cited Section 876 and <u>Halberstam</u> in support of its interpretation of "substantial assistance," knowledge was not at issue in that case either.  <u>See</u> <u>Kilgus</u>, 495 So. 2d at 1231.  And, although <u>Roos</u> relies on Section 876 of the Restatement (Second) of Torts to discuss "acting in concert" liability, the <u>Roos</u> case omits any reference to subsection (b), the relevant provision in <u>Halberstam</u> and this case.  <u>See</u> <u>Roos</u>, 913 So. 2d at 68 n.1.

[15] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

knowledge of the tortfeasor's conduct in the first place."). Notably, the requirement of actual knowledge is not new, but rather "has long been a part of Florida law." See Wiand, 938 F. Supp. 2d at 1247 (collecting cases). Thus, allegations which demonstrate merely constructive knowledge, recklessness or gross negligence cannot satisfy the "knowledge" element of an aiding and abetting claim under Florida law. See id. at 1246-47 (rejecting argument that reckless conduct is sufficient and finding that Florida law requires actual knowledge); see also Honig, 339 F. Supp. 3d at 1344 (finding red flags failed to establish actual knowledge and that the plaintiffs' "attempt to lower this knowledge standard to 'recklessness' is contrary to Florida law"). Consistent with this authority, at the June 20, 2019 Hearing, Plaintiffs conceded that they are proceeding on a theory of "actual knowledge, not should have known." See Tr. at 24.

As such, in determining whether Plaintiffs have stated an aiding and abetting claim against Allergan, the Court considers whether Plaintiffs have alleged facts which give rise to a reasonable inference that Allergan had <u>actual</u> knowledge of the Claymans' underlying misconduct, namely, their fraud on, or breach of fiduciary duty to, their patients.[16] See Tr.

---

[16] In the Motions, Allergan asserts that Plaintiffs must allege facts giving rise to a "strong inference" of knowledge. See Motions at 22 (citing Lamm v. State Street Bank & Trust Co., 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012)). The Court questions whether the "strong inference" pleading standard applies here. While a plaintiff must "allege facts supporting a strong inference of scienter" in securities fraud cases as required by the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b)(2), see Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008), this case does not involve securities fraud. Notably, the line of authority on which Allergan relies stems from the Second Circuit Court of Appeals. See Lamm, 889 F. Supp. 2d at 1332 (relying on a Middle District of Florida case which quoted the "strong inference" language from Rosner v. Bank of China, No. 06 CV 13562, 2008 WL 5416380, at *5 (S.D.N.Y. Dec. 18, 2008)). In the Second Circuit, even prior to the PSLRA, plaintiffs were required "to allege facts that give rise to a strong inference of fraudulent intent" in order "to serve the purposes of Rule 9(b)." See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). The Eleventh Circuit does not appear to interpret Rule 9(b) in the same way. See Mizzaro, 544 F.3d at 1237-38 (outlining the pleading requirements of Rule 9(b) and the "raised standard for pleading scienter" under the PSLRA); but see Perlman, 559 F. App'x at 993-94 (stating both that the allegations failed to raise a "plausible inference" of actual knowledge, and also that the red flags alleged did not "'create a strong inference of actual knowledge'" (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006))). As such, based on the requirements of Twombly and Iqbal, the Court will consider whether "the pleaded factual content allows the court to draw the <u>reasonable</u> inference" that Allergan had

at 23-24.   Although Allergan need not have known all of the details of the underlying misconduct, Plaintiffs must allege sufficient facts from which one can plausibly infer that Allergan was actually aware that the Claymans were lying to their patients about the problems with their breast implants.   Plaintiffs do allege throughout the Second Amended Complaint that Allergan "knew" the Claymans were lying to their patients, <u>see</u> Second Amended Complaint ¶¶ 9, 16, 25, 33, but these general allegations of knowledge are insufficient.   "'While the element of actual knowledge may be alleged generally, the plaintiff still must accompany that general allegation with allegations of specific facts that give rise to a [reasonable] inference of actual knowledge regarding the underlying fraud.'"   <u>See</u> <u>Lamm v. State Street Bank & Trust Co.</u>, 889 F. Supp. 2d 1321 (S.D. Fla. 2012) (quoting <u>Lawrence v. Bank of Am., N.A.</u>, No. 8:09-CV-2162-T-33TGW, 2010 WL 3467501, at *3 (M.D. Fla. Aug. 30, 2010)) <u>aff'd</u>, 749 F.3d 938 (11th Cir. 2014) (alteration added for the reasons stated above in note 16).   Indeed, "[c]onclusory statements that a defendant <u>actually knew</u> [are] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest that the defendant <u>should have known</u> that something was amiss." <u>Id.</u> (alteration in original and internal quotation omitted) (emphasis added).   Thus, the Court must consider whether the underlying facts alleged by Plaintiffs are sufficient to support Plaintiffs' assertions of actual knowledge.   Plaintiffs may rely on allegations of circumstantial evidence to support this knowledge element, but the allegations must do more than merely demonstrate that Allergan <u>should</u> <u>have known</u> about the underlying wrongdoing.

---

actual knowledge of the underlying wrongdoing.   <u>See</u> <u>Iqbal</u>, 556 U.S. at 678 (emphasis added) (citing <u>Twombly</u>, 550 U.S. at 556).

One possible way to plausibly allege actual knowledge is through allegations that an employee of the accused aider-and-abettor herself made misrepresentations or otherwise actively engaged in wrongdoing.  For example, in <u>Chang</u>, the underlying wrongful conduct involved the primary wrongdoer's diversion of client funds from a purported escrow account held at the defendant bank.  <u>Chang</u>, 845 F.3d at 1092.  The plaintiff alleged that a bank vice-president labeled the primary wrongdoer's bank account as an escrow account, despite the wrongdoer's failure to comply with the bank's procedures for opening an escrow account, prepared a letter vastly misrepresenting the amount of funds in the purported escrow account, and secretly received $100,000 from the primary wrongdoer paid to an entity the bank vice-president controlled.  <u>Id.</u> at 1096-97.  The Eleventh Circuit rejected the district court's finding that these allegations showed nothing more than that the bank and the vice-president were engaged in routine banking services, and found that the allegations "support an inference that [the vice-president] knew that [the primary wrongdoer] was misappropriating money."  <u>Id.</u> at 1097.  As the vice-president's interests were not entirely adverse to the bank, the Eleventh Circuit held that her knowledge could be imputed to the bank under Florida law.  <u>Id.</u>

Here, however, Plaintiffs do not allege that any Allergan employee made any false or misleading statements, or otherwise engaged in overt wrongdoing.  Rather, Plaintiffs accuse Allergan of conduct which, in and of itself, is unremarkable: implementing a warranty program for its saline breast implants, analyzing all implants returned to Allergan under the warranty program (as required by the FDA), and approving nearly all warranty claims submitted on behalf of patients of the Clayman Practice, despite having information which would have entitled Allergan to deny the warranty claims.  There is nothing inherently

wrong with Allergan paying warranty claims it could have denied <u>unless</u> Allergan did so <u>knowing</u> that the Claymans were lying to their patients in order to obtain the warranty money from Allergan.  According to Plaintiffs, Allergan knew about the lies because it had in its possession both the warranty forms showing that the Claymans told the patients that their implants were defective and the laboratory reports showing no defects existed. Allergan maintains that this information amounts to no more than "red flags," which it had no duty to investigate, and is therefore insufficient under Florida law to raise an inference of actual knowledge.

In resolving this dispute, the Court finds two Eleventh Circuit cases which address aiding and abetting claims under Florida law instructive.  <u>See</u> <u>Lawrence</u>, 455 F. App'x at 906-07; <u>Perlman</u>, 559 F. App'x at 992-96.  A careful review of the allegations that were and were not sufficient to state a claim in <u>Lawrence</u> and <u>Perlman</u> highlights the distinction between "red flags" and actual knowledge.  Similar to these cases, the instant cases are premised on the theory that a company aided and abetted a primary tortfeasor—a customer—by continuing to do business with the customer despite the customer engaging in suspicious conduct.  Significantly, in both <u>Lawrence</u> and <u>Perlman</u>, the Eleventh Circuit relied on the principle that Florida does not require banking institutions to investigate transactions when providing routine banking services.  <u>See</u> <u>Lawrence</u>, 455 F. App'x at 907; <u>Perlman</u>, 559 F. App'x at 993.  Although Plaintiffs attempt to distinguish their cases on the basis that they involve banks, <u>see</u> Responses at 6 n.3, Plaintiffs do not identify any authority limiting the principles discussed in these cases to banks or authority imposing an affirmative duty on Allergan to investigate the Claymans' medical practices as part of the administration of its warranty program.  Indeed, at the Hearing, Plaintiffs conceded that no

such duty exists and disavowed any attempt to impose an additional duty on Allergan to investigate warranty claims beyond the laboratory analysis it already conducts. <u>See</u> Tr. at 32, 48; <u>see also</u> <u>Swayze v. McNeil Labs., Inc.</u>, 807 F.2d 464, 471 (5th Cir. 1987) ("It is both impractical and unrealistic to expect drug manufacturers to police individual operating rooms . . . ."). As such, the Court finds the Eleventh Circuit's analysis in the banking cases relevant and helpful here. Accordingly, in the analysis that follows, the Court will summarize the facts of <u>Lawrence</u> and <u>Perlman</u>, examine their distinguishing characteristics, and then determine whether Plaintiffs' factual allegations cross the threshold of plausibility.

In <u>Lawrence</u>, the primary wrongdoer had engaged in a Ponzi scheme utilizing accounts set up at the defendant bank. <u>Lawrence</u>, 455 F. App'x at 905. The plaintiffs alleged that the bank knew of the primary wrongdoer's fraudulent activity because he made "exceptionally large deposits into the [bank] account," and "millions of dollars streamed out of the [bank account] to fund personal and gambling expenditures for" the primary wrongdoer. <u>Id.</u> According to the plaintiffs, the primary wrongdoer also told the bank of his personal history and that his business was an "investment club," a type of business that the bank does not permit. <u>Id.</u>[17] Notably, the plaintiffs alleged that the bank's "Premier Banking Representatives" engaged in a standard review of the wrongdoer's account statements. <u>Id.</u> These account statements reflected that:

> Approximately $37,600,000 was deposited by 200 investors, and $15,400,000 was transferred from [the account] to foreign exchange

---

[17] Indeed, the underlying complaint in <u>Lawrence</u> included an allegation that "[bank] policy does not permit investment club accounts but, despite this policy, the [client manager/financial advisors at the bank] authorized and supervised [the primary wrongdoer's] so called investment club account." <u>See</u> <u>Lawrence v. Bank of Am., N.A.</u>, Case No. 8:09-cv-2162, ECF Doc. 1 ¶¶ 32, 35 (M.D. Fla. filed Oct. 23, 2009) (the <u>Lawrence</u> Complaint).

> companies.  However, account statements did not indicate that [the primary wrongdoer] profited from money transferred to foreign exchange companies.  Nevertheless, [the primary wrongdoer] sent investors 2,300 checks totaling more than $15,600,000.

Id.  As such, the "Premier Banking Representatives" who reviewed these account statements "should have known that the money being sent to investors came from new client deposits, rather than profits from foreign exchange companies."  Id.  Specifically, according to the underlying complaint, these "Premier" bankers received updates each morning on the "major deposits and wires" in their clients' accounts.  See Lawrence Complaint ¶ 33.  Any wire transfer over $10,000 had to be approved by the Premier banker or another bank officer.  Id.  The plaintiffs in Lawrence alleged that as a result of these daily updates and the wire approval process, the Premier bankers had "actual knowledge of the day-to-day transactions in his/her client accounts."  Id.  The Lawrence plaintiffs identified the specific banking representatives who were charged with overseeing the primary wrongdoer's accounts, and alleged that these individuals "reviewed the account activity and statements for the [primary wrongdoer's] accounts as part of their ordinary duties."  Id. ¶¶ 37-40.  The plaintiffs then described the series of wire transfers over a two-year period that these individuals observed as part of their job duties.  See id. ¶ 40.  The plaintiffs alleged that "[t]he only inference that can be drawn" from reviewing the history of the primary wrongdoer's accounts "is that [the primary wrongdoer] was running a Ponzi scheme."  Id. ¶¶ 44-45.  Based on this information, the plaintiffs alleged that the Premier bankers "knew" that the primary wrongdoer "was operating an illegal enterprise."  Id. ¶ 47.  The district court found these allegations to be insufficient to plausibly support an inference of actual knowledge and dismissed the case.  Lawrence, 455 F. App'x at 905-06.

On appeal, the Eleventh Circuit per curiam affirmed the dismissal despite the plaintiffs' allegations that the bank "authorized numerous deposits, withdrawals, and wire transfers involving large amounts of money and that the Premier Banking Representatives received substantial commissions." Id. at 907. In doing so, the Eleventh Circuit reasoned that these atypical transactions showed only that the bank "should have known of the Ponzi scheme . . . ." Id. Absent a duty to investigate, the Lawrence court found these allegations "simply fail" to make actual knowledge on the part of the bank plausible. Id.

Similarly, in Perlman, the primary wrongdoer operated a Ponzi scheme and maintained some of the proceeds from this scheme in various accounts with the defendant bank. Perlman, 559 F. App'x at 989. The plaintiff alleged that the bank had knowledge of the scheme based on "[the primary wrongdoer's] opening of various accounts, numerous transfers amongst the accounts within short time periods, thousands of deposits of even dollar amounts, large cash deposits and withdrawals, the absence of any investment activity, and [the bank's] lifting of the freeze on the [suspicious] account without further investigation." Id. at 993. Indeed, the operative complaint included an allegation that soon after the primary wrongdoer opened his accounts at the bank, the bank had noted in an internal document that one of the accounts was engaged in suspicious activity and placed a freeze on the account. Id. at 991. According to the plaintiff, the bank then lifted the freeze after receiving a business plan that was "'nonsensical' on its face and contained numerous obvious inconsistencies." Id. Notably, the primary wrongdoer had previously held his accounts at a different bank which closed the accounts "due to suspicious activity." Id. at 990. Nonetheless, the Eleventh Circuit found these "atypical transactions and procedural oddities" insufficient to raise a plausible inference of actual knowledge. Id. at

993.  The Perlman Court determined that these facts "[a]t most" could "arouse suspicions," but absent any obligation by the bank to investigate, these "red flags" were insufficient to state a claim for relief based on aiding and abetting.  Id. at 993-94.

Significantly, although holding that the claims in the operative complaint were insufficient, the Perlman Court found that the district court erred in denying leave to amend on the basis of futility.  Id. at 994.  Upon review of the proposed amended complaint, the court found sufficient additional factual allegations based on evidence identified by the plaintiff during the discovery process which supported a plausible inference of actual knowledge.  Id. at 995-96.  Specifically, the new allegations described the deposition testimony of the bank's vice-president and financial crimes investigator who had investigated the primary wrongdoer's business accounts and concluded that it was necessary to contact Florida law enforcement and the Internal Revenue Service concerning the activity in the accounts.  Id. at 994-95.  Despite the bank's routine practice of closing accounts within thirty days of detecting confirmed questionable activity, the bank allowed the accounts of the primary wrongdoer to remain open for another three months.  Id. at 995.  The proposed amended complaint also contained new allegations regarding an internal report where a bank investigator noted: unusual activity in the accounts, his discovery of a website describing the business as an "investment club," his conversations with the primary wrongdoer and the wrongdoer's employees, and his conclusion that he would restrain activity on all involved accounts pending further investigation.  Id. at 995-96.  Despite this conclusion, the bank permitted the accounts to remain open and process transactions for another three months.  Id. at 995.  These additional allegations were

sufficient to create a plausible inference that the bank had actual knowledge of the Ponzi scheme and allowed it to continue.  Id.

The difference between the allegations in Lawrence and those in the proposed amended complaint in Perlman is the difference between having information from which one could or even should deduce the existence of fraud, and actually making that deduction.   The plaintiffs in Lawrence relied on allegations that the bank had in its possession information sufficiently indicative of fraud to establish actual knowledge. Indeed, the plaintiffs alleged that specific bank employees had information and actually observed and approved wire transfers and transactions which reflected an obvious Ponzi scheme.   Nonetheless, the Eleventh Circuit characterized these allegations as merely demonstrating that the bank "should have known" about the fraudulent scheme.   See Lawrence, 455 F. App'x at 907; see also Lamm, 749 F.3d at 950-51 (finding allegations that the bank accepted "worthless securities, some of which were not signed by the obligor, not payable to the [account holder], or in default—at most show that [the bank] 'should have known' of [the investment advisor's] fraud and breach of fiduciary duty").   In contrast, the proposed amended complaint in Perlman included allegations of statements from bank employees showing that they actually made the connection between the atypical transactions and an underlying fraudulent scheme such that they recommended the bank contact law enforcement and restrain all activity on the accounts but did not do so for some three months allowing the fraud to continue.   See Perlman, 559 F. App'x at 995-96. According to the Eleventh Circuit, these additional allegations went "beyond 'red flags.' These allegations could support a plausible inference of actual knowledge by Wells Fargo of the Ponzi scheme which it then aided and abetted by permitting the fraud to continue

through use of its accounts after it had actual knowledge of the scheme." Id. at 996.  Thus, the allegations which tipped the scale in Perlman went beyond merely alleging that the bank had information, even obvious information, demonstrating an underlying fraud.  The Perlman plaintiff crossed the threshold into actual knowledge by identifying someone at the bank who reviewed the information and actually drew the inference that the account holder was committing fraud.  See id.[18]

In the Second Amended Complaint, Plaintiffs contend that the following allegations create a plausible inference of Allergan's actual knowledge:

> (1) from the warranty claim forms, which were signed by the patients and Clayman Senior or Junior, Allergan was aware that the Clayman Practice had told patients that their implants were ruptured, deflated, or leaking and needed to be surgically removed and replaced;
>
> (2) for each warranty claim made by the Clayman Practice, Allergan examined the implants at issue and found that they were not defective; and
>
> (3) the Clayman Practice's saline breast implant failure rate of approximately 46% was significantly higher than the failure rate of 1.5% for each year after surgery demonstrated in Allergan's own studies of its saline breast implants.

See Second Amended Complaint ¶ 9.[19]  Plaintiffs argue that this case is akin to Perlman because Allergan repeatedly "investigated" the Claymans' warranty claims and

---

[18] The Court notes that the plaintiff in Perlman was able to add these crucial additional allegations to the proposed second amended complaint based on information obtained through the normal discovery process.  See Perlman, 559 F. App'x at 995 n.8.  In the cases here, Allergan cited the Perlman case and identified the deficiency in the allegations of actual knowledge as a basis for its first motion to dismiss, filed on March 5, 2018, and did so again in its motion to dismiss plaintiffs' first amended complaint.  Despite this, rather than pursue discovery from Allergan on the issue, Plaintiffs agreed to a stay pending the Court's ruling on the motions to dismiss and amended their complaints twice without suggesting that they might need discovery.  See Defendants Allergan, Inc., Allergan Sales, LLC, and Allergan USA, Inc.'s Unopposed Motion to Stay All Deadlines Pending Resolution of Defendants' Motion to Dismiss Plaintiffs' Complaint (Hicks Action, Doc. 8) (Angell Action, Doc. 9), both filed on March 8, 2018; see also Order (Angell Action, Doc. 10) (Hicks Action, Doc. 15) (granting unopposed motion to stay).  Nevertheless, it appears Plaintiffs have engaged in some limited discovery in related cases still pending in state court.  See Tr. at 39-40.

[19] As noted above, Plaintiffs' statistics are problematic for several reasons.  See supra note 10.  Although Allergan identified the problems with Plaintiffs' data in its Motions, Plaintiffs failed to clarify their statistical analysis in their Responses.  As such, the Court is not persuaded that these statistics support an

"determined the claims were false."  <u>See</u> Plaintiffs' Supplements at 4.  According to Plaintiffs, Allergan "investigated" the warranty claims by performing the laboratory analysis. <u>Id.</u>  Once Allergan determined that there was no rupture, deflation, or other defect in the implant, Plaintiffs argue that "[a]t that point, Allergan knew the Claymans had lied to the patient about the defective nature of the implant."  <u>Id.</u>  It is knowledge of this purported "lie," multiplied 5,000 times over, from which, in Plaintiffs' view, one can plausibly infer Allergan's actual knowledge of the Claymans' wrongdoing.  In the Court's view, Plaintiffs' argument is flawed for several reasons.

First, Plaintiffs' argument is built on an assumption that the warranty program and laboratory analysis are inter-related but the Second Amended Complaint provides little factual support for this conclusion.  Allergan is required by the FDA to conduct a laboratory analysis of all explanted implants.[20]  Thus, one cannot infer simply from the fact that Allergan undertook these analyses that it was conducting an "investigation of warranty

---

inference of actual knowledge.  Moreover, as discussed further below, Plaintiffs do not allege that anyone at Allergan was aware of this data, much less that anyone drew the inference from this data that the Claymans were engaged in fraud on their patients.

[20] In the Motions, Allergan argues that its laboratory analysis of returned implants is not a part of its warranty claims process.  <u>See</u> Motions at 7.  According to Allergan, it analyzes returned implants because it is required to do so by the FDA.  <u>See id.</u> at 6-7, Ex. A at 2.  Allergan argues that warranty claims are filed <u>prior</u> to removal surgery based on the surgeon's sworn declaration and that no provision in the warranty program requires Allergan to confirm a deflation prior to honoring the warranty.  Allergan maintains that "as a manufacturer and not a medical practitioner," Allergan "relies on the physician's preoperative medical diagnosis of a deflation as stated by the physician in the warranty claim form."  <u>Id.</u>  The problem with these arguments, however, is that Allergan relies on factual contentions that are not part of the Second Amended Complaint.  Indeed, Allergan conceded at the Hearing that the Court could not rely on this "background" information.  <u>See</u> Tr. at 22.  Thus, although the Court takes judicial notice of the fact that the FDA requires Allergan to perform an analysis of explanted implants, the Court does not rely on Allergan's assertion that it considers only a surgeon's preoperative declaration when reviewing warranty claims.  Nonetheless, the Court does note that it is difficult to discern from the Second Amended Complaint when the laboratory analysis is performed in relation to the payment of a warranty claim and whether the laboratory analysis is part of the warranty process or merely occurring simultaneously with it.  Plaintiffs appear to imply that a claim is paid only after the laboratory analysis, <u>see</u> Second Amended Complaint ¶ 24, but they do not directly allege that Allergan requires, under the terms of the warranty or otherwise, laboratory confirmation of a defect prior to payment.

claims."  Indeed, nowhere in the Second Amended Complaint do Plaintiffs characterize the laboratory analysis as an "investigation of the warranty claims," nor do Plaintiffs directly allege that the laboratory reports are part of the warranty process or even provided to the warranty department.  Moreover, there are no allegations that the terms of the warranty require laboratory confirmation of a defect prior to payment.  Thus, it is altogether unclear from the Second Amended Complaint whether the warranty department was routinely informed of the results of the laboratory analyses, especially where no defect was found which necessitated further investigation as to the cause of the defect.[21]  Plaintiffs' reliance on Allergan's broad institutional knowledge of these two pieces of information is unavailing.  Indeed, in <u>Lawrence</u>, the plaintiffs identified specific individuals at the bank who, pursuant to their job responsibilities, individually had all of the relevant information from which they could have inferred the existence of the underlying fraud.  Despite this, the Eleventh Circuit

---

[21]  Indeed, only one allegation in the Second Amended Complaint suggests that Allergan ever scrutinized the warranty claims it received or questioned doctors about them.  <u>See</u> Second Amended Complaint ¶ 34.  According to Plaintiffs, "[o]ther plastic surgeons report that in response to their saline breast implant warranty claims, Allergan demanded further proof that the claimed ruptures, deflations, or leaks were not the result of actions by patients or surgeons . . . ."  <u>See id.</u>  However, this allegation shows only that in some cases Allergan investigated the <u>cause</u> of a deflation, rupture, or leak to determine whether there was a problem with Allergan's product, or whether the implant failure was attributable to the doctor or patient.  This makes sense given Allergan's obligation to "determine the mode of failure of implants," and report this information to the FDA.  <u>See</u> Motions, Ex. A at 2.  The allegation does not give rise to an inference that Allergan routinely investigated warranty claims where its analysis reveals that the implant was not actually deflated, ruptured or leaking.  The Second Amended Complaint does not contain any allegations that Allergan denied warranty claims from other doctors where Allergan's analysis of the implant did not reveal a defect.  Nor do Plaintiffs correct this deficiency in the proposed third amended complaint.  In the Motions to Amend, Plaintiffs seek to add an additional allegation that Allergan "has denied warranty claims by at least one large plastic surgery practice known to Plaintiffs' counsel."  <u>See</u> Motion to Amend, Ex. 1 ¶ 34.  But this additional allegation still falls short because Plaintiffs do not allege that Allergan denied the warranty claims submitted by this other plastic surgery practice because it examined the implants and determined that they were not defective.  These denials could suggest that the plastic surgery group failed to satisfy the terms of the warranty program or properly submit the claims, or that Allergan had reason to believe that the patient or surgeon was at fault for the implant failure.  Thus, the fact that Allergan denied some warranty claims, at some point, for some reason, does not give rise to an inference that Allergan investigated or denied warranty claims where the laboratory analysis revealed no implant failure, much less that Allergan's treatment of the Claymans was in any way atypical.  Plaintiffs' additional allegation fails to provide sufficient factual matter to push their claim over the threshold from possibility to probability.

found the allegations insufficient to support a plausible inference of actual knowledge. Here, Plaintiffs' allegations do not even suggest that there was a person (or persons) who individually was aware of all of the relevant information, much less facts suggesting that a person made the connection between that information and the Claymans' wrongful conduct.

Nevertheless, even if one can plausibly infer from the Second Amended Complaint that the laboratory analysis reports were provided to the warranty department such that someone had both pieces of information, Plaintiffs' contention that this information together establishes actual knowledge that the Claymans were defrauding or lying to their patients is not well-taken.  In their Responses, Plaintiffs contend that this case is akin to Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006) where the court found that because the bank knew that its customer, an attorney, was commingling personal funds in his attorney-fiduciary account, the bank had actual knowledge of a breach of fiduciary duty. See Lerner, 459 F.3d at 294.  Specifically, the bank knew that the attorney-fiduciary accounts were overdrawn, checks written on the accounts were dishonored for insufficient funds, and the attorney transferred funds from the fiduciary accounts into his personal accounts. Id.  The court explained that this commingling of funds was not "an indication of a breach of fiduciary duty—it was, in and of itself, a breach." Id.  Thus, the bank's knowledge of the commingling activity in the attorney-fiduciary account alone, without further inference or investigation, was actual knowledge of the breach of fiduciary duty.  In notable contrast, the court found that the commingling information was insufficient to establish actual knowledge of fraud because "although [the commingling of accounts] may have put the banks on notice that

some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge of [the attorney's] outright theft of client funds." Id.

Reliance on Lerner is unavailing. Unlike Lerner, the discrepancies between the statements in the warranty forms and the results of the laboratory analyses are not, themselves, a fraud on, or breach of fiduciary duty to, the patients. Such discrepancies could indicate that the Claymans are negligent doctors who routinely, but unintentionally, misdiagnosed deflations. Or, the discrepancies could indicate that the Claymans, although correctly diagnosing their patients, persuaded the patients to sign the warranty forms in order to have Allergan pay for the corrective surgery. Knowledge that the statements on the Claymans' warranty claim forms are inconsistent with the results of the laboratory analyses alone is not, in and of itself, knowledge that the Claymans have committed fraud on, or breached their fiduciary duty to, their patients without drawing further inferences about the likely meaning or cause of these discrepancies. Rather, the discrepancies "may have put [Allergan] on notice that some impropriety may have been taking place," but they do not create a plausible inference of actual knowledge of the Claymans' outright deception of their patients. Id.

Significantly, there are no allegations that anyone from Allergan ever questioned the Claymans to determine the cause of their excessive, invalid warranty claims, much less endeavored to determine what the patients did or did not know about the actual condition of their explanted implants. Indeed, Plaintiffs affirmatively allege that Allergan "never confronted" Clayman Senior about his excessive warranty claims. See Second Amended Complaint ¶ 28. Thus, contrary to Plaintiffs' arguments in their Supplements, the laboratory analyses alleged in this case are not akin to the investigations in Perlman. See Plaintiffs'

Supplements at 4-5.  Unlike the investigations in Perlman, Allergan's laboratory analysis of returned implants do not plausibly suggest that anyone at Allergan was actually suspicious of the Claymans and investigating the legitimacy of their warranty claims.  And most significantly, unlike Perlman, Plaintiffs do not allege that any person within Allergan even suspected, much less concluded, that the Claymans were committing fraud on their patients.  See Perlman, 559 F. App'x at 995 (describing allegations that a bank vice-president reviewed the accounts and "quickly concluded that there was unusual activity occurring in those accounts such that it 'raise[d] the hair on the back of your neck,'" but that, despite the bank's custom to close accounts within 30 days of the "detection of confirmed questionable activity," the accounts remained open for another three months).

Plaintiffs argue that they have plausibly alleged Allergan's actual knowledge of the fraud on the patients given the sheer number of false warranty claims submitted to Allergan.  See Tr. at 33-34, 45-46; see also Plaintiffs' Supplement at 4-5.  According to Plaintiffs, given the volume of invalid warranty claims Allergan received from the Claymans, no other inference but fraud is plausible.  See Tr. at 33-34.  However, like the millions of dollars flowing through the bank accounts in Lawrence and Perlman without any indication of investment profits, these allegations do no more than demonstrate that someone at Allergan should have been suspicious, assuming Allergan actually tracked this data. Indeed, in Lawrence, the court found knowledge insufficiently pled even with allegations that specific bank representatives, who received substantial commissions, engaged in a standard review of the wrongdoer's accounts, authorized numerous transactions, and were therefore actually aware of the suspicious activity.  Lawrence, 455 F. App'x at 905-07. Similarly, in Perlman, the bank had gone so far as to freeze an account for suspicious

activity and then unfreeze the account after receipt of a "nonsensical" business plan, yet the court found these allegations insufficient to show knowledge.  <u>Perlman</u>, 559 F. App'x at 991, 993-94.  Unlike <u>Lawrence</u> and <u>Perlman</u>, Plaintiffs' allegations here are weaker still because there are no allegations to support the inference that anyone at Allergan tracked warranty claims by doctor or practice, that anyone compared the warranty claim to the explanted implant's laboratory analysis, or that anyone was even aware of the pattern of invalid warranty claims from the Clayman Practice, much less that this person connected the volume of invalid warranty claims to an underlying fraud or breach of fiduciary duty to the patients.

In essence, Plaintiffs' argument is that Allergan had in its possession information from which the only plausible inference was that the Claymans were engaged in fraud on their patients.  Plaintiffs maintain that this information was "enough for . . . Allergan to have known that the Clayman practice was falsely stating that the implants were defective, when, in fact, they were not defective."  <u>See</u> Tr. at 31.  The problem for Plaintiffs, however, is that this argument is simply another way of stating that Allergan "<u>should have known</u>" about the underlying fraud.  The plaintiffs in <u>Lawrence</u> also maintained that the bank had information which was enough for the bank to have known that its customer was engaged in a Ponzi scheme.  Indeed, the <u>Lawrence</u> plaintiffs alleged that the existence of a Ponzi scheme was the "only inference that can be drawn" from the account information.  <u>See</u> <u>Lawrence</u> Complaint ¶ 45.  Nonetheless, the Eleventh Circuit found that the existence of the atypical transactions established only that the bank "should have known of the Ponzi scheme," and absent a duty to investigate, were insufficient under Florida law to trigger liability.  <u>See</u> <u>Lawrence</u>, 455 F. App'x at 907.  Similarly, in this case, despite the absence of any

supporting factual allegations, even if the Court assumes that Allergan actually tracked the relevant information, and assumes that someone at Allergan reviewed this data, and accepts Plaintiffs' shaky contention that the only inference one could make from the data is the existence of the underlying fraud on the patients, Plaintiffs have established only that Allergan should have known what the Claymans were doing.  Plaintiffs' allegations may support an inference of recklessness or even gross negligence on the part of Allergan, but neither is sufficient to support a claim of aiding and abetting under Florida law.  See Wiand, 938 F. Supp. 2d at 1246-47; Honig, 339 F. Supp. 3d at 1343-44.  Instead, Plaintiffs must plead allegations supporting an inference of actual knowledge.  Here, Plaintiffs' allegations fall short of alleging facts plausibly supporting the inference that someone at Allergan actually did know what was happening at the Clayman Practice.  Therefore, absent a duty to investigate, which Plaintiffs concede does not exist, see Tr. at 32, 48, Plaintiffs' allegations "simply fail" to make actual knowledge of the Claymans' fraudulent activities plausible.  See Lawrence, 455 F. App'x at 907.

Finally, to the extent Plaintiffs contend that the payment of millions of dollars in baseless warranty claims is itself indicative of knowledge because it represents atypical conduct lacking a business justification, the Court is not persuaded.  See Responses at 5 (citing Woodward, 522 F.2d at 97 ("[I]f the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability.")).  Absent any comparison of the warranty approval rate for the Clayman Practice to that of an analogous practice, the Court cannot infer whether Allergan's approval of all Clayman warranty claims was atypical and indicative of its knowing assistance with the Claymans' fraudulent scheme, or merely reflective of a business

decision not to scrutinize warranty claims in order to foster goodwill with doctors and patients.  Indeed, while Allergan's continued payment of the Claymans' warranty claims is consistent with Plaintiffs' theory of knowledge, it could just as well suggest Allergan's total lack of awareness of the fraud/breach of fiduciary duty.[22]  See Iqbal, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"); Twombly, 550 U.S. at 556-57 (finding that to state a claim for conspiracy, plaintiffs must allege facts that "plausibly suggest[]" agreement, as opposed to being "merely consistent with" an agreement).  And again, even if the continued payment of the claims was negligent, or even reckless, it would fall short of supporting a claim of aiding and abetting under Florida law.

In sum, to adequately state an aiding and abetting claim, Plaintiffs must allege facts from which one can reasonably infer that someone at Allergan actually knew that it was receiving so many invalid warranty claims from the Clayman Practice and that Allergan knew that the reason it received so many invalid warranty claims from the Clayman Practice was because the Claymans were intentionally misdiagnosing the cause of their patients' problems and lying to the patients about it.  The Second Amended Complaint falls short of presenting factual allegations plausibly suggesting that anyone even suspected, much less had actual knowledge, that the Claymans were engaged in this alleged scheme.  It is possible, as Plaintiffs contend, that Allergan suspected the Claymans of lying to their

---

[22] Plaintiffs' motive allegations suffer from the same defect.  See Second Amended Complaint ¶¶ 31-39.  If Allergan used the warranty program as a form of "kickback" to its best customers, as Plaintiffs allege, then Allergan would have paid the warranty claims whether or not it knew about the underlying fraud.  Indeed, the existence of this motive suggests that Allergan had even less reason to track or scrutinize the warranty claims from the Clayman Practice.  Thus, while it is consistent with Plaintiffs' allegation of actual knowledge, it is equally consistent with Allergan's total disregard of what the Claymans were doing.  Such disregard, even if reckless, is insufficient under Florida law to hold Allergan liable.

patients about the problems with their implants in order to make a false warranty claim.  Or, it is possible that Allergan thought the Claymans were routinely, albeit negligently, misdiagnosing implant deflation as the cause of a patient's problems.  It could also be that Allergan suspected that the Claymans were persuading their patients to make false warranty claims so that Allergan would cover the cost of an otherwise necessary revision surgery for the patients' benefit.  It may be that Allergan never compared warranty claims with the laboratory analysis of any explanted implant or that it never analyzed the data necessary to even detect the pattern or perhaps it did, but no one ever considered the implications of that data.  The problem for Plaintiffs is that allegations from which one can reasonably infer only the sheer possibility that Allergan put the pieces together and realized what they assert was happening at the Clayman Practice are insufficient to satisfy the requirements of Twombly and Iqbal.  See Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").

### B. Conspiracy

Next, Plaintiffs assert a claim for conspiracy under Florida law, the elements of which are as follows:

> "(a) An agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to a plaintiff as a result of the acts done under the conspiracy."

See Cordell Consultant, Inc. Money Purchase Plan & Trust v. Abbott, 561 F. App'x 882, 886 (11th Cir. 2014) (quoting Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997)).  Significantly, "[a] conspirator need not take part in the planning, inception, or successful conclusion of a conspiracy."  See Donofrio v. Matassini, 503 So. 2d 1278, 1281

(Fla. 2d Dist. Ct. App. 1987).  Nonetheless, a conspirator must "know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators."  Id.; see also Cordell Consultant, Inc., 561 F. App'x at 886.  Here, for the reasons stated above, Plaintiffs fail to allege facts sufficient to raise a plausible inference that Allergan knew of the Claymans' scheme to defraud its patients or breach their fiduciary duty to them.  As such, Plaintiffs fail to adequately allege an agreement between Allergan and the Claymans and the conspiracy claim is due to be dismissed as well.

### C. Loss of Consortium

Having determined that Plaintiffs' primary claims are due to be dismissed, the Court will dismiss Brett Angell's derivative consortium claim as well.  See Bello v. Johnson, 442 F. App'x 477, 480 (11th Cir. 2011) ("Under Florida law, a claim for loss of consortium 'is a derivative right [for which a husband] may recover only if [his wife] has a cause of action against the same defendant.'" (quoting Gates v. Foley, 247 So. 2d 40, 45 (Fla. 1971))).

## VI.    Conclusion

The allegations regarding the Claymans' practices are indeed disturbing.  The Claymans are accused of egregious violations of their ethical and legal responsibilities to their patients, and it appears that Allergan's warranty program allowed the Claymans to hide and even profit from their wrongdoing.  This case, however, is not about the Claymans. It is about whether Allergan can be held legally responsible for the Claymans' alleged wrongful conduct.  Indeed, in bringing these aiding and abetting claims, Plaintiffs seek to recover damages from Allergan for the Claymans' breach of fiduciary duty to, and fraud on, their own patients.  The problem for Plaintiffs is that to properly allege aiding and abetting liability under Florida law, Plaintiffs must plead facts raising a plausible inference

that Allergan had <u>actual knowledge</u> of the Claymans' tortious conduct.  <u>See</u> <u>Wiand</u>, 938 F.

Supp. 2d at 1247 (collecting cases) (emphasizing that "the requirement of actual

knowledge has long been a part of Florida law").   This is a difficult burden to satisfy, and

after four attempts to do so, Plaintiffs' allegations remain insufficient.   Plaintiffs have

presented persuasive allegations that someone at Allergan <u>should have</u> noticed the pattern

of unsubstantiated warranty claims emanating from the Clayman Practice, and perhaps

<u>could have</u> realized the implications of this data.   But, should have and could have are

insufficient to adequately state a claim for aiding and abetting under Florida law.   <u>See</u>

<u>Lawrence</u>, 455 F. App'x at 907; <u>Perlman</u>, 559 F. App'x at 993; <u>Lamm</u>, 749 F.3d at 950.   As

such, the Motions are due to be granted and these actions dismissed.

In light of the foregoing, it is

**ORDERED**:

1.  As to the <u>Angell</u> Action, 3:18-cv-282-J-34JBT:

    A.  Defendant Allergan Sales, LLC's Motion to Dismiss Plaintiffs' Second
        Amended Complaint (Doc. 46) is **GRANTED**.

    B.  Plaintiffs' Opposed Alternative Motion and Memorandum of Law for Leave to
        File Third Amended Complaint (Doc. 62) is **DENIED**.

2.  As to the <u>Hicks</u> Action, 3:18-cv-283-J-34JBT:

    A.  Defendant Allergan Sales, LLC's Motion to Dismiss Plaintiff's Second
        Amended Complaint (Doc. 46) is **GRANTED**.

    B.  Plaintiffs' Opposed Alternative Motion and Memorandum of Law for Leave to
        File Third Amended Complaint (Doc. 62) is **DENIED**.

3.  The <u>Hicks</u> Action and the <u>Angell</u> Action are **DISMISSED**.

4.  The Clerk of the Court is directed to terminate any pending motions and deadlines in the two cases captioned above and close the files.

5.  On or before **October 1, 2019**, the parties shall confer and file a notice setting forth their respective positions on how they intend to proceed with the related actions that were stayed pending resolution of the motions addressed in this Order.

**DONE AND ORDERED** in Jacksonville, Florida, this 22nd day of August, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record
Pro Se Parties